944 So.2d 460 (2006)
Edith RAPP, Appellant,
v.
JEWS FOR JESUS, INC., Appellee.
No. 4D05-4870.
District Court of Appeal of Florida, Fourth District.
November 29, 2006.
Rehearing Denied January 9, 2007.
*462 Barry M. Silver, Boca Raton, for appellant.
Mathew D. Staver and Anita L. Staver of Liberty Counsel, Maitland, and Erik W. Stanley, Rena M. Lindevaldsen, and Mary E. McAlister of Liberty Counsel, Lynchburg, Virginia, for appellee.
GROSS, J.
This is an appeal from an order dismissing a second amended complaint with prejudice for failure to state a cause of action. See Fla. R. Civ. P. 1.140(b)(6). We reverse in part, holding that the appellant stated claims for false light invasion of privacy and negligent supervision and retention.
In reviewing an order granting a rule 1.140(b)(6) motion to dismiss a complaint, this court's "gaze is limited to the four corners of the complaint." Gladstone v. Smith, 729 So.2d 1002, 1003 (Fla. 4th DCA 1999). The facts alleged in the pleading must be accepted as true and all reasonable inferences are drawn in favor of the plaintiff. See id.
Appellant, Edith Rapp, was married to Marty Rapp until his death in 2003; she is the stepmother to Marty's son, Bruce Rapp. Bruce is a member and employee of appellee, Jews for Jesus, Inc. This lawsuit arises out of the following copy that Bruce caused to be published in a Jews for Jesus newsletter:
Bruce Rapp reports: I had a chance to visit with my father in Southern Florida before my Passover tour. He has been ill for sometime and I was afraid that I may not have another chance to be with him. I had been witnessing to him on the telephone for the past few months. He would listen and allow me to pray for him, but that was about all. On this visit, whenever I talked to my father, my stepmother, Edie (also Jewish), was always close by, listening quietly. Finally, one morning Edie began to ask me questions about Jesus. I explained how G-d gave us Y'Shua (Jesus) as the final sacrifice for our atonement, and showed her the parallels with the Passover Lamb. She began to cry, and when I asked her if she would like to ask G-d for forgiveness for her sins and receive Y'Shua she said yes! My stepmother repeated the sinner's prayer with me praise G-d! Pray for Edie's faith to grow and be strengthened. And please pray for my father Marty's salvation.
The newsletter went on to ask, "Please pray for: grace and strength for new Jewish believer Edie and salvation for her husband, Marty." Beneath a picture of Bruce Rapp was the caption, "Pray for Edie's faith to grow and be strengthened." The newsletter was posted on the internet, where it was seen by a relative of Edith Rapp.
Edith Rapp denied that the events described in the newsletter took place. She alleged that she and Marty were traditional Jews, opposed to Bruce's membership in Jews for Jesus. The core of her lawsuit is that Jews for Jesus falsely, and without her permission, portrayed her as a convert to the organization in a newsletter that it published and distributed.
Edith Rapp filed a 38 paragraph, three-count complaint against Jews for Jesus alleging three causes of action: 1) false light invasion of privacy, 2) defamation, and 3) intentional infliction of emotional distress. The trial court granted appellee's motion to dismiss without prejudice, and also struck, with prejudice, 13 paragraphs from the complaint. The stricken *463 paragraphs were primarily polemical against Jews for Jesus.[1]
Edith Rapp's 81 paragraph amended complaint alleged the same causes of action as the complaint and added a count for negligent training and supervision. The amended complaint contained some of the allegations, word for word, that had been stricken from the original complaint. Again, appellee moved to dismiss and to strike certain paragraphs from this complaint. The trial court granted the motion to strike 13 paragraphs that were the subject of its earlier order, as well as 10 new paragraphs. The court granted the motion to dismiss the invasion of privacy and defamation counts with prejudice, and the intentional infliction of emotional distress and negligent training and supervision counts without prejudice.
Edith Rapp's 101 paragraph second amended complaint attempted to state causes of action for intentional infliction of emotional distress, negligent training and supervision, and negligent infliction of emotional distress. Again, appellee moved to strike certain allegations and to dismiss the complaint for failure to state a cause of action. A successor judge interpreted the earlier judge's orders of dismissal as being based upon the First Amendment, which "prohibit[s] excessive entanglement of the courts in religious disputes." The circuit court granted the motion to dismiss the second amended complaint with prejudice.

The Striking of Redundant, Immaterial, or Scandalous Content
Edith Rapp first contends that the court erred in striking paragraphs from her pleadings. Florida Rule of Civil Procedure Rule 1.140(f) permits "[a] party [to] move to strike . . . redundant, immaterial, impertinent, or scandalous matter from any pleading at any time." Rule 1.110(b) provides that to state a cause of action a complaint "shall contain . . . (2) a short and plain statement of the ultimate facts showing that the pleader is entitled to relief." This pleading rule "forces counsel to recognize the elements of their cause of action and determine whether they have or can develop the facts necessary to support it." Horowitz v. Laske, 855 So.2d 169, 172-73 (Fla. 5th DCA 2003).
The stricken paragraphs detail the theological animosity between the plaintiff and Jews for Jesus; they are redundant, bellicose, and unnecessary to state the causes of action alleged. A complaint in a lawsuit is not a press release. The hallmarks of good pleading are brevity and clarity in the statement of the essential facts upon which the claim for relief rests "rather than intricate and complex allegations designed *464 to plead a litigant to victory." Ranger Constr. Indus., Inc. v. Martin Cos. of Daytona, Inc., 881 So.2d 677, 680 (Fla. 5th DCA 2004). We find no abuse of discretion in the circuit court's striking of paragraphs from the complaints.

The First Amendment Does Not Bar the Tort Actions
We reject the circuit court's conclusion that the First Amendment of the United States Constitution bars Edith Rapp's third-party tort action against Jews for Jesus. In Malicki v. Doe, 814 So.2d 347, 355 (Fla.2002), the Florida Supreme Court recognized that the First Amendment "prevents courts from resolving internal church disputes that would require adjudication of questions of religious doctrine." However, the supreme court distinguished intrachurch disputes from "disputes between churches and third parties." Id. at 356. The court recognized that the First Amendment does not apply to "`purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization.'" Id. at 357 (quoting Bell v. Presbyterian Church, 126 F.3d 328, 331 (4th Cir.1997) (quoting Gen. Council on Fin. & Admin. of the United Methodist Church v. California Superior Court, 439 U.S. 1369, 1373, 99 S.Ct. 35, 58 L.Ed.2d 63 (1978))).
None of the tort claims in this case flowed from an employment dispute between a church and a member of the clergy. Compare Goodman v. Temple Shir Ami, Inc., 712 So.2d 775 (Fla. 3d DCA 1998); Heard v. Johnson, 810 A.2d 871, 875 (D.C.Ct.App.2002). The conduct at issue in this casethe publication of false statements about a non-member of the religious groupdoes not implicate a tenet of religious belief. See Malicki, 814 So.2d at 361.
The House of God v. White, 792 So.2d 491 (Fla. 4th DCA 2001), does not control this case. There, a church member sued a church and its pastor for slander because the pastor called the member a "`slut' while standing at the church altar in front of the other clergy and church parishioners." Id. at 492. We held that the First Amendment barred the slander action against the church, because the "substantive issues" raised by the action "would require excessive entanglement with church policies, practices, and beliefs as they involve claims against the church." Id. at 494. This case does not involve a member of a church, so the case does not involve an evaluation of the interaction between a clergyman and a parishioner. Also, The House of God, relied on Doe v. Evans, 718 So.2d 286 (Fla. 4th DCA 1998), a case which the supreme court disapproved in Malicki. 814 So.2d at 365. After Malicki, the viability of a defamation claim in an ecclesiastical setting requires close evaluation of the circumstances surrounding the claim. See Heard, 810 A.2d at 884-85.

Defamation
Viewing the allegations of the complaint in the light most favorable to the plaintiff, we find that Edith Rapp failed to state a cause of action for defamation, because the "common mind" reading the newsletter would not have found Edith to be an object of "hatred, distrust, ridicule, contempt or disgrace."
The elements of a defamation claim include:
(a) a false and defamatory statement concerning another;
(b) an unprivileged publication to a third party;
(c) fault amounting at least to negligence on the part of the publisher; and
(d) either actionability of the statement irrespective of special harm or the existence *465 of special harm caused by the publication.
Thomas v. Jacksonville Television, Inc., 699 So.2d 800, 803-04 (Fla. 1st DCA 1997) (quoting RESTATEMENT (SECOND) OF TORTS § 558 (1977)). The statements here at issue were published in a newsletter and disseminated over the internet; therefore, libel is the type of defamation alleged. Section 568(1) of the Second Restatement of Torts defines libel as "the publication of defamatory matter by written or printed words, by its embodiment in physical form or by any other form of communication that has the potentially harmful qualities characteristic of written or printed words."
In the context of this case, a publication is libelous if it "carr[ies] statements tending to subject a person to hatred, distrust, ridicule, contempt or disgrace." Adams v. News-Journal Corp., 84 So.2d 549, 551 (Fla.1955). Such a communication is defamatory "if it tends to harm the reputation of another [so] as to lower him or her in estimation of community or deter third persons from associating or dealing with the defamed party." LRX, Inc. v. Horizon Assocs. Joint Venture, 842 So.2d 881, 885 (Fla. 4th DCA 2003) (quoting RESTATEMENT (SECOND) OF TORTS § 559); see also Mile Marker v. Petersen Publ'g, L.L.C., 811 So.2d 841, 845 (Fla. 4th DCA 2002); Thomas v. Jacksonville Television, Inc., 699 So.2d 800, 803 (Fla. 1st DCA 1997).
To evaluate the content of a communication, "the words should be given a reasonable construction in view of the thought intended to be conveyed," construed as the "`common mind' would naturally have understood them." Wolfson v. Kirk, 273 So.2d 774, 778 (Fla. 4th DCA 1973); see also Adams, 84 So.2d at 551; Richard v. Gray, 62 So.2d 597, 598 (Fla. 1953). A court must consider "the medium by which the statement is disseminated and the audience to which it is published." From v. Tallahassee Democrat, Inc., 400 So.2d 52, 57 (Fla. 1st DCA 1981) (quoting Info. Control v. Genesis One Computer Corp., 611 F.2d 781, 784 (9th Cir.1980)). To determine whether language is defamatory, the words used should be construed not "in their mildest or most grievous sense," but in that sense "in which they may be understood and in which they appear to have been used and according to the ideas which they were adopted to convey to those who hear them or to whom they are addressed." Loeb v. Geronemus, 66 So.2d 241, 245 (Fla.1953) (quoting Budd v. J.Y. Gooch Co., 157 Fla. 716, 27 So.2d 72, 74 (1946)); see Joopanenko v. Gavagan, 67 So.2d 434, 436 (Fla.1953) (quoting Budd in holding that statement that a man was a "Communist" stated a cause of action for slander).
Applying these principles, we find that the language in the Jews for Jesus newsletter was not defamatory. The newsletter was intended for group members who would have viewed the information in a positive light. To the common mind, the idea intended to be conveyed in the newsletter was neither derogatory nor hateful. The posting of the newsletter on a Jews for Jesus internet site was similarly addressed to an audience with an interest in the group's message.
Under the "common mind" rule, the newsletter portrayed Edith Rapp in the most positive light. However, one view of defamation law is that language need not prejudice the plaintiff in the eyes of a majority of the community to be defamatory; it is defamatory if the plaintiff is prejudiced in the eyes of a substantial and respectable minority of the community. See Marcoux-Norton v. Kmart Corp., 907 F.Supp. 766, 778 (D.Vt.1993); Farnsworth v. Hyde, 266 Or. 236, 512 P.2d 1003, 1004 (1973). As Comment e to section 559 of *466 the Restatement (Second) of Torts explains:
A communication to be defamatory need not tend to prejudice the other in the eyes of everyone in the community or of all of his associates, nor even in the eyes of a majority of them. It is enough that the communication would tend to prejudice him in the eyes of a substantial and respectable minority of them, and that it is made to one or more of them or in a manner that makes it proper to assume that it will reach them. On the other hand, it is not enough that the communication would be derogatory in the view of a single individual or a very small group of persons, if the group is not large enough to constitute a substantial minority. If the communication is defamatory only in the eyes of a minority group, it must be shown that it has reached one or more persons of that group . . . Although defamation is not a question of majority opinion, neither is it a question of the existence of some individual or individuals with views sufficiently peculiar to regard as derogatory what the vast majority of persons regard as innocent. The fact that a communication tends to prejudice another in the eyes of even a substantial group is not enough if the group is one whose standards are so anti-social that it is not proper for the courts to recognize them.
Under comment e to section 559, a fair reading of the newsletter article is that Edith Rapp had forsaken her Jewish beliefs and accepted the central tenet of Christianity. It is an understatement to say that people take their religious beliefs seriously. To devout members of a religious group, the statement that a member has converted to another religion, with a different concept of the deity, tends to prejudice the convert in the eyes of the group, to subject the convert to "ridicule, contempt or disgrace." Adams, 84 So.2d at 551. A group's sincere religious beliefs are not so "anti-social" that a court should not recognize that persons will act upon them in their treatment of a member who has been labeled a convert. In the words of comment e, members of the Jewish religion, along with Muslims, Buddhists, and other religious groups, are a "substantial and respectable minority" in this country. The amended complaint alleged that the newsletter had been released over the internet, where a relative of Edith Rapp noticed it, thereby satisfying the requirement that the communication reached those who would view it as defamatory. For these reasons, applying comment e to section 559, a court might well find that the amended complaint stated a claim for defamation.
We have found no case where the Florida Supreme Court has adopted section 559, comment e. Therefore, we affirm that portion of the order dismissing the defamation cause of action.

Intentional Infliction of Emotional Distress
To successfully state a cause of action for intentional infliction of emotional distress, the plaintiff must plead "conduct `so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Allen v. Walker, 810 So.2d 1090, 1091 (Fla. 4th DCA 2002) (quoting Metro. Life Ins. Co. v. McCarson, 467 So.2d 277, 278-79 (Fla.1985) (quoting RESTATEMENT (SECOND) OF TORTS § 46 (1965))). "Whether alleged conduct is outrageous enough to support a claim of intentional infliction of emotional distress is a matter of law, not a question of fact." Gandy v. Trans World Computer Tech. Group, 787 So.2d 116, 119 (Fla. 2d DCA *467 2001) (citing Ponton v. Scarfone, 468 So.2d 1009 (Fla. 2d DCA 1985)).
The newsletter publication falls short of conduct required to support the tort of intentional infliction of emotional distress. The language in question occurred in a praise report primarily intended for the eyes of like-minded individuals who would view the subject matter in a positive light. As appellee observes, the report "describes a pleasant and eventually joyous visit with Bruce Rapp's family." Edith Rapp's reliance on Nims v. Harrison, 768 So.2d 1198 (Fla. 1st DCA 2000), is misplaced. Comparing the extreme and vile conduct in Nims to what happened here is like comparing apples to raisins. Also, Edith Rapp relies on her subjective response to the publication; however, the "subjective response of the person who is the target of the actor's conduct does not control the question of whether the tort occurred." State Farm Mut. Auto. Ins. Co. v. Novotny, 657 So.2d 1210, 1213 (Fla. 5th DCA 1995) (internal citations omitted).

False Light Invasion of Privacy
In Allstate Insurance Co. v. Ginsberg, 863 So.2d 156, 162 (Fla.2003), the supreme court stated that Florida recognizes the tort of invasion of privacy. The court approved its statement in an earlier case that there are four categories of invasion of privacy:
(1) appropriation-the unauthorized use of a person's name or likeness to obtain some benefit; (2) intrusion-physically or electronically intruding into one's private quarters; (3) public disclosure of private facts-the dissemination of truthful private information which a reasonable person would find objectionable; and (4) false light in the public eye-publication of facts which place a person in a false light even though the facts themselves may not be defamatory.
Id. at 162 (quoting Agency for Health Care Admin. v. Assoc. Indus. of Fla., Inc., 678 So.2d 1239, 1252 n. 20 (Fla.1996)); see also Loft v. Fuller, 408 So.2d 619 (Fla. 4th DCA 1981); Guin v. City of Riviera Beach, 388 So.2d 604 (Fla. 4th DCA 1980). These four categories of invasion of privacy are the ones "recognized by Prosser in his Law of Torts, p. 804-14 (4th Ed. 1971)." Loft, 408 So.2d at 622.
The fourth category of the tort is "publication of facts which place a person in a false light even though the facts themselves may not be defamatory." Allstate Ins. Co., 863 So.2d at 162; see Agency for Health Care Admin., 678 So.2d at 1252 n. 20. The false light theory of invasion of privacy was incorporated in section 652E of the Restatement (Second) of Torts, which defines the cause of action as follows:
[o]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.
See Gannett Co., Inc. v. Anderson, ___ So.2d ___, ___, 2006 WL 2986459 at *3 (Fla. 1st DCA Oct. 20, 2006).
Publicity is "highly offensive to a reasonable person" when a "reasonable man [] would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity." RESTATEMENT (SECOND) OF TORTS § 652E, cmt. c. The tort involves a "major misrepresentation" of a person's "character, history, *468 activities or beliefs." Id. As an illustration of false light invasion of privacy, the Restatement describes a situation where a tortfeasor publicly circulates a Democrat's name, over his objection, on a petition nominating a Republican for office. See RESTATEMENT (SECOND) OF TORTS § 652E, Illustration 4. Difference of religion causes at least as many quarrels than difference of politics; therefore public misrepresentation of a person's religious beliefs, involving conduct more extreme than Illustration 4, falls within the Restatement's definition of the tort. Appellee contends that the amended complaint failed to allege sufficient scope of publication, because dissemination in a newsletter "cannot be so widespread as to be regarded as substantially certain to become public knowledge." However, the allegation that the newsletter was posted on the internet satisfies the publication requirement of the tort. The amended complaint adequately stated a claim for false light invasion of privacy.
The supreme court has never expressly held that an action for false light invasion of privacy is cognizable in Florida courts. The court tacitly recognized the cause of action in Ginsberg and Agency for Health Care. Similarly, this court has tacitly recognized false light privacy claims. See Cox v. Wiod, Inc., 764 So.2d 671 (Fla. 4th DCA 2000) (reversing the dismissal of various claims including false light privacy on the ground of failure to prosecute); Byrd v. Hustler Magazine, Inc., 433 So.2d 593 (Fla. 4th DCA 1983) (reversing a judgment in a libel and false light case on the ground that the plaintiff failed to prove falsity); Loft, 408 So.2d at 619 (listing the four kinds of privacy claims in a privacy action based on the theory of unauthorized use of private facts); Cape Publ'n, Inc. v. Bridges, 387 So.2d 436, 440 n. 6 (Fla. 4th DCA 1980) (stating in dictum that actual malice would be required to prove a false light claim).
Recently, in Gannett, Judge Padovano conducted a scholarly review of the false light invasion of privacy cause of action. No. 1D05-2179, ___ So.2d at ___, 2006 WL 2986459, at *1 (Fla. 1st DCA Oct. 20, 2006). He points out that some courts have declined to recognize the cause of action, because "it duplicates a cause of action for defamation while allowing the plaintiff to escape the strict requirements that are designed to ensure freedom of expression." Id. at ___, at *4. Other courts "have also expressed the concern that a false light action lacks the protections that apply in defamation cases." Id. Although the majority of states recognize the cause of action, false light "remains the subject of a heated debate among judges and legal scholars." Id.
Were we writing on a blank slate, we would be inclined to side with those courts rejecting the false light cause of action. However, Ginsberg and Agency for Health Care, as well as cases from this court, have given false light invasion of privacy a toehold in Florida law. Along with Judge Padovano, we have been unable to find a case where a "Florida appellate court affirmed a judgment for the plaintiff in a false light invasion of privacy case." Gannett, No. 1D05-2179, ___ So.2d at ___, 2006 WL 2986459 at *6. In light of what we perceive to be some uncertainty in the area, we certify the following question as being one of great public importance: Does Florida recognize the tort of false light invasion of privacy, and if so, are the elements of the tort set forth in section 652E of Restatement (Second) of Torts?
Based on the foregoing, we affirm the circuit court's dismissal of the intentional infliction of emotional distress and defamation claims and reverse the dismissal of the false light invasion of privacy claim. Because *469 the dismissal of the negligent training and supervision claim was based on the dismissal of the other claims, we also reverse the dismissal of that count. Appellant has abandoned her claim for negligent infliction of emotional distress. On remand, appellant should be given leave to succinctly replead her claims, without excessive editorialization, so that there is one working complaint, and not causes of action sprinkled in various pleadings.
GUNTHER and FARMER, JJ., concur.
NOTES
[1] For example, paragraph 3 of the complaint alleged that "[d]efendant Jews for Jesus uses many false assertions and deception in order to try to induce members of the Jewish faith to abandon the beliefs of their heritage yet believe they are still Jews." Paragraph 29 stated that "Jews for Jesus is based on a fraud, thus they think nothing of making fraudulent and defamatory statements about others in order to further their objectives." Another stricken paragraph describes Edith Rapp's version of the theological disagreement between Judaism and Jews for Jesus:

The primary goal of Jews for Jesus is to convince Jews to accept beliefs which directly contradict the most fundamental concepts of Judaism, and still believe that they can remain Jews. Many of the core beliefs of Jews for Jesus directly contradict the most basic concepts of Judaism. These ideas of Jews for Jesus that are antithetical to Jewish beliefs include that G-d at one time took human form, that G-d is three not one, that an "original sin" committed by Adam has contaminated the entire human race, that G-d will punish us forever for the sins of Adam, that unless we adopt the beliefs of Jews for Jesus G-d will send us to eternal torment, that we can be absolved from sin by the suffering of another, that Jesus fulfilled the Jewish concept of the Messiah, and other similar ideas.