699 So.2d 800 (1997)
Janie G. THOMAS, Sonny Wiles, L.L. Hodges, Jean Van Goidtsnoven and all other parties situated, Appellants,
v.
JACKSONVILLE TELEVISION, INC., d/b/a WJKS-Channel 17, Clear Channel Television, Inc., d/b/a WAWS-Channel 30, WTLV-TV, Inc., d/b/a WTLV-Channel 12, and Post-Newsweek Stations, Inc., d/b/a WJXT-Channel 4, Appellees.
No. 96-706.
District Court of Appeal of Florida, First District.
September 25, 1997.
*801 Arthur I. Jacobs of Jacobs & Associates, Fernandina Beach, for appellants.
Gregg D. Thomas, Carol Jean LoCicero and David S. Bralow of Holland & Knight, Tampa, for appellee Jacksonville Television, Inc., d/b/a WJKS-Channel 17.
George D. Gabel, Jr., Suzanne M. Judas and Brooks C. Rathet of Gabel & Hair, Jacksonville, for appellees Clear Channel Television, Inc., d/b/a WAWS-Channel 30 and WTLV-TV, INC., d/b/a WTLV-Channel 12.
*802 William A. Bald of Dale, Bald & Altes, P.A., Jacksonville, for appellee Post-Newsweek, Inc., d/b/a WJXT-Channel 4.
JOANOS, Judge.
Appellants seek review of an order dismissing with prejudice a class action defamation complaint. The complaint was filed on behalf of 436 commercial net fishermen residing in Duval County and surrounding counties in the defendants'/appellees' broadcast area. Appellees are four North Florida television stations. The complaint alleged that the defendant television stations broadcast an advertisement prepared and distributed by Save Our Sealife, Inc., even though the stations were on notice that the advertisement was deceptive and misleading. The trial court dismissed the defamation action with prejudice, based on the court's finding that appellants failed to satisfy the "of and concerning" requirement of a cause of action in tort. We affirm.
This cause arose in 1994 in the context of pre-election activities related to proposed Amendment 3 to the Florida Constitution. The ultimate adoption of the proposed amendment greatly restricted commercial net fishing in Florida's coastal waters. Save Our Sealife, Inc. was organized to promote passage of Amendment 3. The advertisement at issue was broadcast by the appellee television stations around November 1, 1994, in support of the passage of Amendment 3.
Appellants contend that a false and defamatory advertisement prepared by Save Our Sealife, Inc. and broadcast by the named television stations injured their business reputation with the public, and destroyed an occupation and means of providing sustenance which dates back to the beginning of recorded history. The excerpt of the complaint quoted below sets forth appellants' specific objections to the advertisement prepared by Save Our Sealife, Inc., as well as the grounds underlying the defamation allegations against the named television stations:
20. The advertisement consists of several visual scenes impliedly showing purported, negative consequences of current commercial net fishing off Florida's coast. The scenes are overlaid by a verbal sound track recounting and decrying alleged negative consequences of such commercial net fishing. The obvious and intended import of the advertisement when viewed as a whole is to represent that each of the visual scenes in the advertisement reflects currently occurring negative consequences of commercial net fishing off Florida's coasts.
21. The advertisement is deceptive and misleading in the following respects:
a. First, one scene in the advertisement shows dead fish being dumped over the side of a boat. When viewed in conjunction with the verbal overlay, the scene creates the impression and implication that the fish died as a result of current commercial net fishing off Florida's coast. In fact the vessel from which the fish are being dumped is named the "Georgia Bulldog". The "Georgia Bulldog" is a University of Georgia research vessel, not a commercial fishing boat. The fish in the scene are being dumped over the side of the "Georgia Bulldog" in a 1988 experiment conducted by the University from that boat and are not fish whose death was caused by current commercial net fishing off the coast of Florida. See Exhibits "B" and "C" attached hereto and signed by the associate director of Marine Extension Services, University of Georgia, who was personally on-board the "Georgia Bulldog" when this video footage was shot by the Audubon Society.
b. Second, another scene in the advertisement portrays a helpless turtle on its back. When viewed in conjunction with the scene's verbal overlay, the obvious implication and import of the scene is that the turtle is about to die as a result of current commercial net fishing off Florida's coast. In fact the turtle shown in the advertisement is a turtle caught by the University of Georgia in a 1988 experiment conducted, again from the "Georgia Bulldog". It was not caught in a commercial fisherman's net nor was it caught by current, Florida-based, commercial net fishermen. The turtle did not die, but was safely placed back in the water by University *803 of Georgia personnel shortly after the footage was shot.
c. A third scene in the advertisement shows a dolphin caught in a fishing net. When viewed in conjunction with the scene's verbal overlay, the clear import and implication of the scene is that the dolphin died as a result of current commercial net fishing off the coast of Florida. In fact the dolphin shown in the scene is of a type found only in the Pacific Ocean and thus the advertisement is deceptive and misleading.
d. The final scene is of two dolphins in the water. The implication of the scene when viewed in conjunction with the scene's verbal overlay is that the two dolphins are in Florida coastal waters and are about to be killed by a current commercial fishing net. The dolphins shown were not killed in Florida waters. In support thereof Plaintiffs submit that according to the Department of Natural Resources of the State of Florida, whose responsibilities include the tracking of marine sealife fatalities, there have been only ten (10) dolphin deaths attributable to commercial fishing operations off Florida's coasts reported over the past ten (10) years and there are no known videos of any of the said dolphin deaths.
22. When viewed as a whole, these combined deceptive and misleading scenes represent a clear and intentional attempt to mislead well-intentioned and conservation-minded voters in the State of Florida into believing that Amendment 3 is necessary to prevent the scenes of "horror" portrayed in the advertisement, although the scenes simply do not reflect consequences of current commercial net fishing off the coasts of Florida. As a result, the advertisement is false and fraudulent and clearly intended to mislead voters in the State of Florida.
23. On November 4, 1994, David L. Harrington, associate director of the University of Georgia, Marine Extension Service and MAS leader informed Defendants by copy of the letter attached as Exhibit "B", that the advertisement their station was running was "fraudulent" and being used to deceive voters in the state of Florida over the merits of Amendment 3.
24. Knowing the words and images selected for the broadcast were false and fraudulent, Defendants intended that the Florida public be deceived. Defendants received monetary payments for the broadcasting of this false and fraudulent advertisement.
25. The clear implication was that Plaintiffs and other class members were irresponsible, indiscriminate killers of Sealife particularly dolphin and sea turtles.
26. The Defendants allowed the false, deceptive, fraudulent, and defamatory advertisements to run subsequent to receiving independent notice of the advertisement's false and fraudulent nature. Defendants were actors and participants in the use of false and defamatory material in a negligent manner without reasonable care as to whether the defamatory advertisements were true or false.
The Restatement (Second) of Torts, section 559, explains that "[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Under Florida law, "[a] civil action for libel will lie when there has been a false and unprivileged publication by letter, or otherwise, which exposes a person to distrust, hatred, contempt, ridicule or obloquy or which causes such person to be avoided, or which has a tendency to injure such person in his office, occupation, business or employment." Cooper v. Miami Herald Publishing Co., 159 Fla. 296, 31 So.2d 382, 384 (Fla. 1947). Accord Richard v. Gray, 62 So.2d 597, 598 (Fla.1953); Axelrod v. Califano, 357 So.2d 1048, 1050 (Fla. 1st DCA 1978).
The elements of a defamation claim include:
(a) a false and defamatory statement concerning another;
(b) an unprivileged publication to a third party;
(c) fault amounting at least to negligence on the part of the publisher; and

*804 (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.
Restatement (Second) of Torts § 558 (1977). To state a cause of action against a media defendant for the common law tort of libel, "a private person must allege publication (1) of false and defamatory statements of and concerning that private person, (2) without reasonable care as to the truth or falsity of those statements, (3) resulting in actual damage to that private person." Hay v. Independent Newspapers, Inc., 450 So.2d 293, 294-295 (Fla. 2d DCA 1984). See also Cooper v. Miami Herald Publishing Co., 31 So.2d at 384; American Ideal Management, Inc. v. Dale Village, Inc., 567 So.2d 497, 498 (Fla. 4th DCA 1990). Since the decision in Gertz,[1] a private individual may recover actual damages from a media defendant that published "false and defamatory statements without reasonable care to determine their falsity." Boyles v. Mid-Florida Television Corp., 431 So.2d 627, 633 (Fla. 5th DCA 1983), approved, 467 So.2d 282, 283 (Fla. 1985). See also Hay v. Independent Newspapers, 450 So.2d at 294-295.
Section 770.04, Florida Statutes, this state's provision dealing with a radio or television broadcaster's civil liability for defamation, states in part:
The owner, licensee, or operator of a radio or television broadcasting station, and the agents or employees of any such owner, licensee or operator, shall not be liable for any damages for any defamatory statement published or uttered in or as a part of a radio or television broadcast, ... unless it shall be alleged and proved by the complaining party, that such owner, licensee, operator, general agent or employee, has failed to exercise due care to prevent the publication or utterance of such statement in such broadcasts, ... (emphasis supplied).
Section 564 of the Restatement describes defamation of a group or class in the following manner:
One who publishes defamatory matter concerning a group or class of persons is subject to liability to an individual member of it if, but only if,
(a) the group or class is so small that the matter can reasonably be understood to refer to the member, or
(b) the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member.
The Comment to section 564A explains:

a. As a general rule no action lies for the publication of defamatory words concerning a large group or class of persons. Unless the group itself is an unincorporated association, ... it cannot maintain the action; and no individual member of the group can recover for such broad and general defamation. The words are not reasonably understood to have any personal application to any individual unless there are circumstances that give them such an application....

b. When the group or class defamed is sufficiently small, the words may reasonably be understood to have personal reference and application to any member of it, so that he is defamed as an individual. In this case he can recover for defamation.... It is not possible to set definite limits as to the size of the group or class, but the cases in which recovery has been allowed usually have involved numbers of 25 or fewer.
....

d. Even when the group or class defamed is a large one, there may be circumstances that are known to the readers or hearers and which give the words such a personal application to the individual that he may be defamed as effectively as if he alone were named....
*805 Florida and federal cases dealing with group defamation consistently hold that a cause of action for group libel cannot be maintained unless it is shown that the libelous statements are "of and concerning" the plaintiff. Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); McIver v. Tallahassee Democrat, Inc., 489 So.2d 793, 794 (Fla. 1st DCA), review denied, 500 So.2d 544 (Fla. 1986); Hay v. Independent Newspapers, Inc., 450 So.2d at 294.
Plaintiffs face a difficult task when the statements concern groups; when a group is large, that is, composed of twenty-five or more members, courts consistently hold that plaintiffs cannot show the statements were "of and concerning" them. AIDS Counseling and Testing Centers v. Group W Television, Inc., 903 F.2d 1000, 1005 (4th Cir.1990); Anyanwu v. Columbia Broadcasting System, Inc., 887 F.Supp. 690, 692 (S.D.N.Y.1995)(although the "of and concerning" requirement is generally a question of fact for the jury, "it can be decided as a matter of law where the statements `are incapable of supporting a jury's finding that the allegedly libelous statements refer to a plaintiff' ... an impersonal reproach of an indeterminate class is not actionable."); Auvil v. CBS, 800 F.Supp. 928, 933, 935 (E.D.Wash.1992)("When an entire class is defamed, it is usually difficult to show that class-wide allegations could be said to be directed to each individual.")
The legal principles and authorities relied upon by appellants would be relevant to the factual allegations of their complaint, if the complaint met the threshold "of and concerning" requirement. In paragraph fifteen of the complaint, appellants attempt to demonstrate that each plaintiff and each class member suffered the same harm in their respective individual capacities. Arguably, section 564A of the Restatement (Second) of Torts contemplates a situation such as this, in which defamation of commercial net fishing has personal application to each individual who follows that occupation. Unfortunately, the allegations of appellants' complaint do not satisfy the essential element of a libel claim, that is, appellants have failed to advance a colorable claim that they were identified and described by the defamatory broadcasts.
Of course, we have before us only the allegations on the face of the complaint. Further, because the complaint was dismissed at an early stage of the litigation, the television stations here have not had an opportunity to respond to these serious allegations. It may be that, if this action were to proceed, the appellees would be able to produce evidence establishing that the broadcasts did not falsely dramatize commercial fishing practices off the Florida coast. Nevertheless, based solely on the complaint, we are troubled by the alleged indifference of the named television stations to their obligation to truth. The alleged continued broadcast of the advertisement prepared by Save Our Sealife, Inc. after the named television stations received reliable evidence that the advertisement conveyed false and misleading information to their viewing public, if true, is very serious. The alleged knowing perpetuation of a deception has even graver implications in the circumstances of this case. Here, there were significant political and economic ramifications attendant upon the voters' decision as to Amendment 3. The failure of television broadcasters to act responsibly and professionally when provided with information that they were broadcasting false and misleading information to the public at large, if true, had the potential to exacerbate an already emotionally charged issue.
We would hope that in an informed society, callous indifference to the truth or falsity of the material broadcast by a television station when it occurs will act as much to the detriment of the station as it does to the public that is supposedly served. In our view, conduct of that nature should so imbue the public with a resigned skepticism concerning the information broadcast by the station as to dull the effectiveness of all of its other broadcasts. In this sense, the conduct of the television broadcaster would have contributed directly to the ultimate decrease or demise of its own effectiveness.
We harbor a hope that a sense of responsibility would prevent the alleged conduct from occurring so that public confidence may reside *806 in the dispensers of news. Since our hope is tempered by a recognition that financial gain or loss is sometimes the primary motivating factor in commercial ventures, we invite the legislature to consider regulation of disparagement of an occupation, in a manner akin to regulation of disparagement of a product.
We also agree with the trial court's conclusion that appellants are unable to amend their complaint to state a cause of action which will satisfy the "of and concerning" requirement. Cooper v. Miami Herald Publishing Co., 159 Fla. 296, 31 So.2d 382 (1947); Posigian v. American Reliance Insurance Co., 549 So.2d 751, 754 (Fla. 3d DCA 1989). See also Weitzel v. State, 306 So.2d 188, 193 (Fla. 1st DCA 1974), dismissed, 322 So.2d 922 (Fla.1975).
Accordingly, we affirm the trial court's order dismissing appellants' class action complaint with prejudice.
PADOVANO and VAN NORTWICK, JJ., concur.
NOTES
[1] In Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court held that a newspaper or broadcaster publishing defamatory falsehoods about a private individual, i.e., one who is not a public official or public figure, may not claim a constitutional privilege against liability for injury, on the ground of a privilege protecting public discussion of any public issue.